Jackson, Rives & Pettus, of Birmingham, for appellant.

21 So.2d 568

**NATIONAL CASUALTY CO. v. HUDSON.**

6 Div. 142.

Court of Appeals of Alabama.

March 27, 1945.

70

G. R. Harsh, of Birmingham, for appellee.

CARR, Judge.

This suit was originally filed by appellee, Mrs. Etta M. Hudson, against appellant, National Casualty Company, in the Intermediate Civil Court of Birmingham. It is sought in the complaint to recover damages for the alleged breach of an indemnity provision in an insurance contract. The basis for the claim is for surgical and hospital services incident to an operation on Ronald Hudson, a member under the policy contract. After judgment in favor of appellee in the primary court, appellant appealed to the circuit court, where the cause was tried by the judge without aid of a jury. Again, appellee was successful in obtaining a judgment. This appeal is to this court from the latter judgment.

In the circuit court the original complaint was refiled and, by agreement of counsel, the pleadings were in short by consent.

■ It is urged here that the complaint, refiled in the circuit court, fails to state a cause of action and therefore will not support a judgment. In this view we cannot concur. The sufficiency of the complaint was not tested by demurrer, and, even so, the procedure and practice in the Intermediate Civil Court of Birmingham are governed by the laws applicable to procedure and practice in the justice of the peace courts. Formal complaint is not required. Local Acts 1935, Secs. 12, 14, and 18, pp. 223 and 224; Title 13, Sec. 395, Code 1940; Bessemer Ice Delivery Co. v. Brannen, 138 Ala. 157, 35 So. 56; Hitt Lbr. Co. v. Turner, 187 Ala. 56, 65 So. 807.

As we understand the record in this case and points advanced in assignments of error and arguments in brief, the controlling question decisive of this appeal centers around the construction and interpretation of the insuring clause in the policy as it is related to the words "sickness" and "such sickness", found therein.

The clause is: "This policy provides indemnity for loss due to hospital expense resulting from bodily injury effected solely through accidental means while this policy is in force which injury is the sole cause of loss (hereinafter referred to as 'such injury'), and for loss due to hospital expense caused by sickness which is contracted and begins after this policy has been maintained in force for not less than thirty (30) days and causing loss commencing while this policy is in force (hereinafter referred to as 'such sickness')."

To intelligently review the matter, it is necessary to analyze the tendencies of the evidence.

At the time of the hospitalization—the basis of this suit—Ronald Hudson was ap-

proximately ten years of age. He had always lived in the home with his parents. His father and mother testified that Ronald had actively participated in various games with his playmates. He played football, baseball, swam, rode a bicycle, and in every respect enjoyed the life of a normal boy. Up to a short time before the operation in question, they had never observed, in the use of his legs, any indication of physical handicap. He had a perfect attendance record in the public schools for the years 1942 and 1943. The parents testified, also, that the first time they noticed any trouble with the child's knees was about the first of May, 1943. This discomfort was evidenced by complaint of pain and weakness in the knee joints. A physician was promptly consulted and the operation followed on June 7th, 1943. Ronald testified to like import. The record shows that the application for the policy is dated January 21, 1943.

On direct examination, Dr. Shannon, the attending surgeon, stated: "What I observed was that Ronald had a very small underdeveloped knee cap on both sides. They were unstable and our diagnosis was bilateral, congenital and dislocated patellæ. My first observation of his knees, close observation of his knees, was in May 1943 the findings that I just stated, small underdeveloped knee caps; they didn't cause him to limp, I think one could say it gave him a peculiar walk. I think it is impossible to describe it any further than that. The knee caps were easily movable, to one side particularly, and they would slip too far to the outer side of the knee joint. This caused him to walk stiffly or awkwardly— but it would not be noticeable to the casual observer."

With reference to the operation, the doctor testified: "Reconstruction surgery in simple language means Ronald's knee caps when he would extend his leg in that manner would move to the side, over to the outer side. The whole knee joint was opened up and the patella ligament attached to the shin bone was taken out— broken from the attachment and disjoined. Over here further on the medial side of the shin bone is the quadricepts tendon, and between the medial side and the lateral side an elliptical piece of the capsule was removed from the capsule and an incision made on the lateral side and an elliptical piece which had been removed was placed here, which caused the knee cap, then to pull over to the medial side, which really amounted to a snubbing up of the capsule on the medial side. I wouldn't say rebuilding, but reconstruction is a good word. I would say that Ronald afflicted with that condition prior to the operation was disabled to some extent at least as far as his walking was concerned."

Where a clause in an insurance policy is susceptible of two constructions, it will be construed liberally in favor of the insured and strictly against the insurer. This is a recognized rule in this State. Pilgrim Health & Life Ins. Co. v. Carner, 214 Ala. 408, 108 So. 37.

We are unable to find an authority in factual similarity to the instant case. We must, therefore, resort to the examination and study of cases which, by logical analogy, will aid us in reaching a solution to the inquiry at hand.

"Sickness" is "any morbid condition of the body. * * * which for the time being hinders and prevents the organs from normally discharging their several functions. [It is] any affection of the body which deprives it temporarily of the power to fulfill its usual functions." Martin v. Waycross Coca-Cola Bottling Co., 18 Ga.App. 226, 89 S.E. 495, 496. See also, 29 C.J., Sec. 7, p. 280; Milam v. Norwich Union Indemnity Co., 107 W.Va. 574, 149 S.E. 668; Independent Life Ins. Co. of America v. Butler, 221 Ala. 501, 129 So. 466; Black v. Travellers' Ins. Co., 3 Cir., 121 F. 732, 61 L.R.A. 500.

We find many cases where the courts have had occasion to determine what constitutes sickness, disease, deformity, infirmity, etc., as applied to alleged breach of warranties in applications for insurance contracts.

In Leftwich v. Inter-Ocean Casualty Co., 123 W.Va. 577, 17 S.E.2d 209, 212, we observe: "Even if it may be said that the record shows that Leftwich was affected with glaucoma simplex prior to the effective date of the policy, there is nothing to indicate that he was incapacitated from the performance of his usual duties prior to February 16, 1940."

See also, Cohen v. North American Life & Casualty Co., 150 Minn. 507, 185 N.W. 939.

In Davidson v. First American Ins. Co., 129 Neb. 184, 261 N.W. 144, 146, we find: "Assuming that the condition of the teeth of the assured was the sole cause of her disability, the appellee would be entitled to

recover if the disease or illness first manifested itself after the 14-day period provided in the policy, even though the medical cause may have antedated the issuance of the policy."

In the case of Hilts v. United States Casualty Co., 176 Mo. 635, 159 S.W. 771, 773, the St. Louis Court of Appeals had under consideration the question of liability vel non for hernia operation provided in an insurance contract. It was urged that the insured had hernia prior to the effective date of the policy, in which event, under the terms of the policy, the benefit would be voided. The court held: "There is no suggestion that he had such a hernia at the time that the policy was issued to him, though it may be that plaintiff had a predisposition to hernia or that by violent physical exertion, prior to the issuance of the policy, the inguinal ring was weakened, causing the hernia to subsequently develop."

A fair inference from the testimony in the instant case leads us to the conclusion that the court below was authorized to find that the operation on Ronald's knee was necessitated by reason of a malady congenital in nature. We are equally clear in the view that the lower court was privileged to find also from the evidence that this congenital mal-normality did not exert itself to the extent of affecting the use of the child's limbs in discharging their normal functions until after the effective date of the policy. The sole fact of the congenital history of the abnormality would not, in our opinion, preclude the application of the principles stated in the above cited authorities.

In this view we are supported by the holding of the New York Court of Appeals in the case of Eastern District Piece Dye Works v. Travelers' Insurance Co., 234 N.Y. 441, 138 N.E. 401, 402, 26 L.R.A. 1505. We quote from the body of the opinion: "* * * and the abnormal formation which led to the fatal operation had existed from birth, did not in any manner interfere with the normal operation of the parts in question, and could not have been known by the insured."

Reverting to the case at bar, unquestionably this contract of insurance intended to give a benefit to the insured that would afford protection if sickness should occur after the policy had been in force for not less than 30 days. The time the sickness should begin is made important.

It is indicated by the judgment that the lower court reached the conclusion that, although from the standpoint of medical science the initial cause for the operation may have antedated the issuance of the policy, the condition did not manifest itself to the extent of hindering or preventing the afflicted organ from fulfilling its normal function until after the benefits accrued in the contract. The latter event having occurred, the protection ripened and the insurer became liable. We will not disturb this judgment. It is ordered that the case be affirmed.

Affirmed.